Good morning. May it please the Court, I am Tim Zindel from the Federal Defender's Office in Sacramento on behalf of the appellant Mr. Mostad. Is that the way you say it, Mostad? Mostad, yes. I apologize for my earlier mispronunciation there. So, Your Honor, we're dealing with regulations that can be very confusing and people take different views of them, but this is actually a very simple matter. In this case, Mr. Mostad posits that it was unfair of the government to prosecute him for doing what it allowed him to do. Well, with respect, the permit that he was operating under had a termination date and when they found him doing things that were not permitted, it was after the permit had expired. So it was like he was out there with no right whatsoever to do anything. Doesn't that change our analysis here? No, Your Honor. The activity that was charged was all charged, with the exception of Count 7, as occurring no later than October. There was no specified date. They did not charge him specifically with doing anything except failing to winterize after the termination date of October 15th. The only count that has a specific date in it is Count 7 of the information, and that is that he did not winterize as of October 16th or backfill the holes. And was that defined in the charge? What, winterize? I realize there's a technical difference. It was failing to backfill the holes, and they charged that as a violation of a term of the operating plan. There's a particular problem with that charge that's different from the other issues, which is that the only hole that he excavated is this hole that the government at trial labeled Habitat Pond that is basically Site G on the map. But that's the only hole he excavated, and that was a hole that the map specifically allowed him to use. Do you agree that with respect to that G, Section G, the hole, the pond, I guess it was, actually, that by his failure to backfill that, or his backfilling that, or whatever he was supposed to do, and the permit had expired, that he had knowingly violated the law? No. The reason is that G, and the map is at the excerpt of record, the second volume at 116 or at the supplemental at 243. This site, these are the three sites that he proposed to excavate. Site G is, I've circled it, but there's a circle around it. G is marked in the center of the pond. This is what they called Habitat Pond. And the entirety of the a complaint about the fact that he dug in Habitat Pond, that the Count 7 charged him with failing to backfill the pond. But all the witnesses testified that they never wanted him to backfill that pond. They didn't want him to. They said that they didn't want him to dig there in the first place, which is contradicted by the map. So he was, even though the plan required him to backfill excavations, the only excavation that he engaged in was not one that anyone desired him to backfill. Let me make sure I understand. My understanding was he wasn't to do anything in that pond at all. He was supposed to stay away from it. That's wrong. That's wrong. That's wrong. Okay. This is where I'm afraid that the Court will get tangled up, and I hope the Court does not. Well, just a minute. Was there anything in his permit, one way or the other, that related specifically to that pond? There's nothing in the text. The map identifies that as one of the three excavation sites. The map is the extent of the thing that marks what he was asking to do, what he was permitted to do by the district ranger. And at trial, various inferior officers, the minerals officers, all said, oh, no, no. We told him he couldn't do that. We only met this X, which is next to the G. That was we told him that. None of that really matters. The district ranger approved him to conduct activities consistent with this map, and the map clearly marked G as proposed excavation. And there's something in writing to that effect? Yes, the district ranger's approval, which is in the excavation. This was a court trial, right? I'm sorry? This was a court trial, not a jury trial, right? It was a court trial, yes. Okay. Now, so were those issues you just were discussing, were they brought up at the trial? So what was the magistrate's response to that? Your Honor, the answer is more of a pragmatic one. I think the government crafted this case to give a great deal of eye appeal to it. So the great deal of what? Eye appeal or emotional appeal. So they took this old mining site that existed in the 19th century that was a dig hole, and they called it Habitat Pond. And then they called two witnesses, Greg Shimkey and Dave Brown, who were minerals officers, to testify that notwithstanding the map that clearly identified the pond as the place that Mr. Mostad intended to excavate and the place that had been approved for him to excavate by the district ranger, they both testified So did the magistrate judge make some kind of ruling of whether he thought the map controlled or some wording in the premise controlled or the testimony controlled? No. But he must have believed the testimony. He believed the testimony. He said he believed the testimony. There was contradictory testimony. There was a video that was played for him in which Mr. Shimkey, who was the prime was heard to say, we authorized that. So Mr. Shimkey was cross-examined about that. He claimed he didn't remember it, but there was a video showing him those excerpts, quotations from that, and his testimony about it in the record. Following up on my colleague here, my notes suggest that the 2008 plan that had the revised map showed some work that bordered on Pond G and the vegetation areas, but not within them, and that the authorization was for limited geological sampling without the use of water. Do you disagree with that? That's in S.E.R. 212. The 2008 plan, well, at trial, the one I was concerned with was the 2009 plan. There was extensive testimony about the differences. No, I understand. I'm just, it kind of goes along that same line. The initial plan did not allow water, but in June or July, there was a supplement that was authorized by the district ranger to allow Mr. Bostad to use a wash plant that was on site. That's supplemental excerpts at 250. What I see to the amendment to the 2009 plan noted that your client was still, in quotes, not authorized to conduct any new surface disturbing activities other than those described in the previous authorization, and the cite on that is ER 123. So, again, please correct me if I've misunderstood, but I thought that certainly by the time of the 2009 plan, your client was not supposed to be digging in the pond, and you're saying that's wrong. Let me make it clear. I copied the one out of the supplemental excerpts, which is the same, because it was in color. If you look at the conditions of approval, they're at page 245, and what they say is that in the third paragraph, this is page 24, description and scope of operation, sampling of alluvial gravels utilizing the on-site excavator will involve opening test holes as shown on the attached site map to bedrock. The attached site map is page 243. And does that include the pond? Absolutely. Okay, so we've got to... In two ways. It's marked as G, and then it says proposed excavation sites. Number one is G. So, again, I think at trial, the government succeeded in shifting the focus from the plan of operations that had been approved by the district ranger and the map itself and allowed the minerals officers to say that, oh, no, no, no, we told him something different. But under the regulations, 228 and 261, the plan itself is what becomes the measure of what Mr. Mostad is allowed to do. So bottom line, from your perspective, the plan, as amended, permitted your client to dig in and use the pond. What about the vegetation area alongside? They charged him with damaging the riparian vegetation, but the plan itself allowed him to dig up to three holes down to bedrock, which would have been 50 feet. He never dug that far. And in the process of doing that, he is going to be removing vast amount of minerals. There is nothing in the plan that says where he should put it or where he should not put it. And the point... And the plans were approved, or these were just proposals? No, these were approved by the district ranger. That's the March 24, 2009 document. And it's supplemental excerpts, I believe, page 244 and subsequent. And, Your Honor, the point, I think, that escaped the attention of the magistrate judge and perhaps the district judge as well is that a plan of operations exists specifically to authorize miners to do things that other users of the forest would not be allowed to do. That's recognized in the Part 261 prohibitions in 261.1 small a, which says specifically that forest officers may allow persons in plans of operations to do things that would otherwise be prohibited. In this case, it's essentially the Forest Service allowed Mr. Mostad to make an omelet, but then they complained that in the process of doing so, he broke several eggs. It simply can't be, as a matter of fairness, that the district ranger approves a plan for him to dig 50 feet down to bedrock and remove and test gravels on the opposite side of the river or the opposite side of the stream from where he's excavating and then complain, well, you dumped those tailings on vegetation. Of course he's going to dump the tailings on vegetation. Of course he's going to cause surface resource disturbance. That's why he's applied for a plan of operations, and that's why the ranger has approved it. Let me get your understanding. Obviously, your perspective of the controlling documents and that of the government is entirely different. I mean, they couldn't be more different. So let's see if I can get your understanding of this. Let's just say hypothetically that there was no disagreement about what your client could do or not do up to a certain time period, but that he continued to do what he was barred doing after that time period, and then they charged him. Would you agree that if that happened, the fairness argument really goes away because he would be doing what he was doing without authorization? Yes. If he were doing, it would be like Dorebus. I'd like to reserve some time for rebuttal, but I'd also like to answer your question. The Dorebus case, their plan of operations said you can have no more than five trenches open at a time. And when the Forest Service came along to inspect, they had 30. So it was a clear violation of the plan. Mr. Mostad's case, there was not a count that charged him with going beyond the plan of operations. And the mining activity all occurred between March, when the plan was approved, and October. So as of the time of the inspection, there's simply no evidence to show that those tailings were pushed there after the plan ended. And the original plan, which was supplemented but not overturned, ran through October 31st. The original plan that was approved by the – ran through October 31st. I'll save the rest of my time for rebuttal. Thank you. Robert R. Tews, representing the United States. Your Honor, I'd like to first address the issue of Habitat Pond and the various maps that were drawn. The record does show that there were various iterations of the maps, particularly at SCR 243 was a map that was originally drawn by the defendant. And that clearly shows an X right in the middle of Habitat Pond. That's that site labeled G, indicating that it was the defendant's intent to mine in that area. And there was testimony presented at trial that the defendant and the Forest Service had extensive discussions about avoiding that particular area because it was a habitat for wildlife. Not only avoiding that area, but also avoiding the riparian vegetation surrounding the river, which was important to protect the river from pollution. After that discussion, there was another revision to the map at SCR 243. Before going on, let me ask this. Yes. You're saying the defendant proposed these things. Did the government ever agree that the pond or the vegetation area could be included? No, Your Honor. There was extensive testimony at trial that that was discussed with the Forest Service between the Forest Service and the defendant. And the Forest Service made it very clear that the defendant was not supposed to disturb that pond and not supposed to disturb the areas around the river. Okay. So this is a permit. He asked for the permit. He proposed a map. Are you saying that that permit never became, this must have been 2008, that that never became, was never finalized, never approved? Is that what you're saying? No, the plans were approved, but not the initial. It would be in writing then, and in writing you would know one way or another whether you could go into the pond or the vegetation area, right? Yes, Your Honor. There were several iterations, and some of them were rejected. Like, particularly the plan at 232 where there was an X in the middle of the pond. That was rejected. And then the defendant revised the plan to move that X to the southeast of the pond away from the pond, evidencing that there was a discussion and there was a decision made that he was supposed to mine in an old dig hole that was approximately 150 feet away from the pond, and that's testimony at SCR 106 to 107, an area away from the pond, and he was supposed to avoid the pond. I'm concerned about . . . I used to do a lot of land use planning, so this stuff's very familiar to me, and this should all be in writing. What they talked about, I really don't care. What I want to know is, what was in the document? Was there ever a time that either the 2008 or the 2009 plan allowed the defendant to use or excavate the vegetation area of the pond? No, Your Honor. The plan, the 2009 approval, which referenced the revised map, there's an X on that map that's away from the pond, indicating that where he was supposed to mine was not at the location of the pond, and that's considered . . . And was there ever one that allowed him to use or excavate the vegetation area? No, Your Honor. There's nothing that explicitly discusses it, although the map that was consistent with the approval at 243 does show areas that were used for dumping mine waste. That's areas A and B. And did any of that include part of the vegetation area or the pond? No, Your Honor. That was away from the pond and also away from the riparian vegetation that surrounded the river. And the defendant disregarded those areas and decided to dump his mining waste where he thought it was convenient, which was on top of vegetation that was there to protect the river and also the pond. So bottom line, and this is the way I understood it before your opponent started talking to us, the government claims that you had permits, 2008 amended, I guess, in 2009, but that did not permit the defendant to utilize the pond or the vegetation area, and there were certain other aspects of it, that the . . . I think it was, what, October the 15th it all had to be finished? Yes, Your Honor. Now there's . . . he says it goes through October 31. What's your point to that? Yes, Your Honor. So at some point, the defendant applied to modify, to amend his prior plan. The prior plan was for dry processing only. And that stated all mining had to be finished, all holes had to be filled in by the 15th of October. And that was not done. However, that plan also indicated that it expired on the 31st. Now presumably . . . What does that mean? Well, it's implicit in the plan, Your Honor, that between the 15th, when he was supposed to have everything finished, and the 31st, the defendant was supposed to basically get all his stuff out of there, remove . . . Isn't that the same thing? Sorry? Isn't that the same thing? Everything's supposed to be finished on the 15th, and then you say the 31st to get it out of there? Well, the mining and the winterization was supposed to be completed on the 15th. However, there's nothing in there that talks about, you know, removing his equipment and getting his shelters out of there. That . . . Is it fair to say that that aspect of the permit was vague? No, Your Honor. What was very clear in the permit was that all mining and winterization was to be completed by the 15th. And that's what's charged in the . . . Was winterization defined? Winterization is not defined in the plan. That's somewhat of a term of art with the Forest Service and miners, which essentially means preparing the area for the winter months. I kind of get that, but this is a criminal offense. You can't charge somebody criminally unless they know what the offense is. What is clear in the plan is that he was supposed to have all the holes backfilled by the 15th. That is in the plan. And that's what he did not do, because there was a hole, an old mining hole, where he was authorized to dig about southeast of the pond. And he, in fact, did dig there. And when the Forest Service inspected that area on both October 21st and the 30th, that hole was still there. Not only was that hole there, he had dug out and destroyed the pond that was some . . . at least 100 feet away from where he was supposed to be digging. So that, from your perspective, that part is very clear. He wasn't supposed to be digging or using the pond. He wasn't supposed to put tilings in the vegetation area. The holes were supposed to be filled in by October the 15th. Yes. So that was clear from your perspective. I'm a little concerned about this October 31st date, what that meant. You're supposed to winterize it by the 15th, holes filled in by the 15th. He was never supposed to be putting the pond in the vegetation area in the first place. What was left to do between the 15th of October and the 31st of October? It doesn't . . . the plan does not specify that. But it allows him, for example, to occupy that area up until the 15th. But it does not . . . the plan did not allow him to mine. That was very clear. Well, is that what it says, or are you just assuming that? The plan does reference occupancy, that he's allowed to be on that — in that area, at least occupying. Prior to the 15th, he was allowed to be in that area for the purpose of mining. But after the 15th . . . He could picnic there. Potentially. But I think, Your Honor, based on the discussions, the testimony and the discussions between Forest Service and the defendant, it's apparent that one of the things he was supposed to do in that time frame between the 15th and the 31st was to get out of there. Because he was not supposed to have any equipment in that area. But could he have been confused about the time framework? In other words, could he have thought that he had until the 31st to finish filling the holes? No, Your Honor, because it's very clearly stated in the plans of operation. In fact, in the revised plan, when he sought to modify his plan to switch from dry operations to wet operations, it says very clearly in that plan, in bold, separate from the other text in that letter, that he had to be completely finished with those operations by the 15th of October. And those were the wet operations. And when the Forest Service went out on the 21st of October, he was engaged in full scale mining. Not only doing wet operations, but going far beyond the geological sampling that he was supposed to be limited to under all of the plans. He wanted to skip over all the permitting, all the sampling, and jump straight to full scale mining, because he wanted the gold in those rocks. And that's why he was cited for numerous violations, because he exceeded the scope of his plan. His plan, his wet operations plan, was expired, and he continued to mine. And in fact, the record shows that he was confronted with these issues, and he told the Forest Service that they had no authority to regulate him there, and he was not going to listen to the district ranger. He was going to listen to a consultant that he hired separately to advise him on these issues. And so he made very clear that he was not interested in following the regulations of the Forest Service. Breyer, sounds like a minor to me. Yes, Your Honor. If I may, if I may, in general, the crux of the defense's case here, the appellant's case here, is notice. And the defendant was given notice at various stages of his mining operations, and also after the expiration of his plans, not only through the plans themselves and his discussions with the Forest Service, but he was told verbally on the 21st of October that what he was doing was illegal, and he needed to stop, and he refused to do so. And then on the 30th, the Forest Service came back again, and at that time, they gave him a cease and desist letter and told him, with written notice, that he was violating the terms of an expired plan, and he had to be out of there. And he was also told at that time that he was to submit a restoration and remediation plan to the district ranger in an effort to try to work through these issues and try to restore what damage he had done, and he refused to do that as well. And the team went back in January, well after the expiration of these plans, and he still had his equipment out there. And in fact, at that time is when they saw one of the excavators leaking significant oil near the Downey River. This was January? January 2010. And then he was charged. He wasn't charged by information by my office until July 2010. So the evidence presented at trial shows that he was given notice at numerous stages of this process, both at the time that he was actually mining and negotiating the scopes of his plan, and also at the time they did two inspections in October, and they actually witnessed him doing things outside the scope of his plan. So there's sufficient evidence here to show the defendant was given adequate notice not only prior to the charges that were brought in this case, but also after the charges were brought, he was allowed to present his administrative defenses in front of the magistrate judge and try to argue that he was treated unfairly or that what he was doing was supposedly under the rules or the regulations, and the magistrate court rejected those arguments and found him guilty on all charges. And so, Your Honor, on that, I will submit unless the court has other questions. Other questions? All right. Thank you very much. Thank you. So we will hear from Mr. Mostad. Again, I reiterate, I think it's really unfair of the government to put the burden on Mr. Mostad by enforcing or by charging him with criminal violations for work that in hindsight the Forest Service believes is sloppy. I mean, the bottom line is that the district ranger approved him to mine extensively at this site in a plan of operations, specifically in Fort Brady. I thought he was supposed to be doing test samples. There's a lot of difference between taking test samples and mining. Well, if the test sample is under the 50 feet of rock that she allowed him to remove, then you're going to have to remove a lot of dirt to get down to that place. You're looking for gold mines. You're looking for gold. He's basically a plaster miner. He was allowed by the plan specifically to dig down to bedrock. You got to remove a lot of dirt and a lot of rock to get down to bedrock. So I mean, it's unavoidable. You cannot make an omelet without breaking eggs. And so he may have broken more eggs than they had anticipated, than the mineral officers had anticipated. But the district ranger approved that, and they never did anything to go inspect, which they're required to do. They never did anything to tell Mr. Mostad we think you're going too far, which they're required to do. They showed up in late October, and they said, oh, my God, you're doing all these things that we don't think you should be doing. But he was specifically allowed to do it by the plan. The excavator charge is an example. There was just a question about that. The excavator was found to be leaking in January, so they charged him with leaving it there in October. But in the cease and desist notice that they gave him when they went back at the end of October, they told him, don't move the excavator. This is just not fair. It's simply not fair. Mr. Mostad was authorized in a written plan of operations to do what he did. As to all of his activity, the only one, the only charge that specifically alleged he did something past the authorization date was that he didn't backfill after October 15th. That's the only thing that specifically references any language in the plan. But the thing that he didn't backfill was the thing that they claimed they didn't want him to backfill. They didn't want him to. They said, well, we didn't want him to dig there at all. But the map specifically allowed him to do that. And there was no intention of the Forest Service to have that backfilled ever. Other questions about my colleague? No. I don't think not. Thank you very much. Thank you. I appreciate it. Thank you both for your argument. The case, just argued, is submitted.
judges: Tashima, M. Smith, Piersol